IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

BRANDON CARTER,
Claimant Below, Petitioner

FILED

December 22, 2025

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

v.) No. 25-ICA-209          (JCN: 2023010386)

SEVEN RIVERS DESIGN BUILD, LLC,
Employer Below, Respondent

## MEMORANDUM DECISION

Petitioner Brandon Carter appeals the April 16, 2025, order of the Workers' Compensation Board of Review ("Board"). Respondent Seven Rivers Design Build, LLC ("Seven Rivers") filed a response.[1] Mr. Carter filed a reply. The issue on appeal is whether the Board erred in affirming the claim administrator's order, which granted a 0% permanent partial disability ("PPD") award.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the Board's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On November 17, 2022, Mr. Carter (twenty years old) sustained significant injuries when he fell about fifteen feet from a forklift. The injuries included multiple facial fractures, a skull fracture, a liver laceration, and a splenic laceration. Three days after the injury, Mr. Carter underwent a surgical repair of the fractures in his jawbone and face.

On December 6, 2022, Cole Sloboda, D.O., a neurosurgeon, examined Mr. Carter after his discharge from the hospital. Dr. Sloboda noted that Mr. Carter was being closely monitored for a cerebrospinal fluid ("CSF") leak due to the frontal sinus fracture. Mr. Carter reported that oxycodone was controlling his intermittent headache and facial pain, but he noted that several times every day, he had watery drainage from his nose, and some emotional lability was also present. Dr. Sloboda diagnosed a facial fracture, traumatic brain injury, traumatic epidural hematoma with loss of consciousness, subarachnoid hemorrhage, conductive hearing loss in the left ear, liver laceration, spleen laceration, impaired communication with impaired cognition, and traumatic CSF leak. Upon review of Mr.

---

[1] Mr. Carter is represented by Linda N. Garrett, Esq., and Robert F. Vaughan, Esq. Seven Rivers is represented by Steven K. Wellman, Esq., and James W. Heslep, Esq.

Carter's head CT, Dr. Sloboda determined that the epidural hemorrhage over the temporal lobe had decreased in size, but a pneumocephalus was still present. Clinically, Dr. Sloboda observed that Mr. Carter became angry when he talked about his injury, and watery drainage from his nose, concerning for CSF, occurred at that time. Dr. Sloboda had Mr. Carter readmitted to the hospital for placement of a lumbar drain. Mr. Carter remained hospitalized until December 13, 2022, at which time the lumbar drain and jaw wiring were removed. Cara M. Rogers, D.O., a neurosurgeon, noted in the discharge report that Mr. Carter's parents stated that he continued to have issues with emotional lability. Dr. Rogers advised Mr. Carter that he could expect to have headaches, and she instructed him to use oxycodone to relieve them.

By order dated December 14, 2022, the claim administrator held the claim compensable for a left anterior temporal epidural hematoma. An MRI of Mr. Carter's brain, performed on January 10, 2023, revealed that the maxillofacial, orbital, and calvarial fractures were healing, but the right condyle process of the mandible remained ununited, and a fragment was displaced. Also, the epidural hematomas were found to be largely resolved, although trace residual hemorrhagic products remained. A focal disruption was noted along the left anterior horn and encephalomalacia relating to hemorrhagic contusions along the right frontal lobe. Some viscous material was noted in the left frontal sinus adjacent to a fracture site, and some mild mucosal thickening was seen throughout the remainder of the left frontal sinus.

On April 19, 2023, Joseph E. Grady II, M.D., evaluated Mr. Carter for the compensable conditions of unspecified injury of the head, unspecified fracture of the skull, laceration of the lip, and epidural hemorrhage with loss of consciousness. Dr. Grady noted that the medical records revealed that Mr. Carter received some cognitive therapy for his reported memory and comprehension deficits. Mr. Carter told Dr. Grady that he had decreased energy and sleep since the injury, but he denied problems with anxiety or depression. However, Mr. Carter told Dr. Grady that he had episodes of feeling like he is "in a dream," and he complained of intermittent episodes of pain in his head, which were sharp but brief. Dr. Grady opined that the pain could be a post-concussion symptom, but that it did not seem linked to any particular structure. Mr. Carter told Dr. Grady that he was not using any medication except Ibuprofen, and that he had been referred to an orthodontist due to his misaligned jaw.

According to Dr. Grady, Dr. Rogers placed Mr. Carter at maximum medical improvement ("MMI") in March of 2023, and released him to return to work with the following restrictions: no working at heights; initially, return to work at part-time; and that he take breaks during work. Mr. Carter told Dr. Grady that his employer could not accommodate the restrictions. Dr. Grady indicated that he agreed that Mr. Carter should be restricted from working at heights, but he did not think that part time work or breaks were necessary. Based on his examination, Dr. Grady found that Mr. Carter had reached MMI for the resolved epidural hemorrhage, healed skull fracture, and healed lip laceration. Dr.

Grady was unsure whether the orthodontic referral was required as a result of the work injury, but he felt that such an evaluation was reasonable because Mr. Carter's overbite was possibly due to the mandibular fracture. Dr. Grady found that Mr. Carter's MMI status depended upon whether orthodontic intervention was going to be pursued. Further, Dr. Grady said that he could not exclude the possibility that post-concussion syndrome caused Mr. Carter's feeling that he was "in a dream." Thus, Dr. Grady mentioned that neuropsychiatric testing could be considered.

Dr. Grady referred to the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) (*"Guides"*), Section 9.2 on pages 229 and 230, and found no ratable impairment for the lip laceration or skull fractures, as these conditions had healed without residual facial disfigurement or deformity. Under Tables 1 and 2 on pages 225 and 226 of the *Guides*, Dr. Grady found no impairment for an audiogram DSHL[2] score of forty in the right ear and seventy in the left ear. Finally, he found no specific ratable impairment for the type of headaches experienced by Mr. Carter. Dr. Grady concluded that Mr. Carter had 0% WPI for his compensable conditions. However, Dr. Grady offered that if neuropsychiatric testing is performed, he could review it and issue an addendum to his report.

On April 23, 2023, New River Mobility Driver Rehabilitation issued a report regarding a driver evaluation it conducted to assess Mr. Carter's potential to independently operate a motor vehicle following his traumatic brain injury on November 17, 2022. The evaluator observed no mood swings, emotional lability, or short-term memory deficits. During the on-road assessment, the evaluator found that Mr. Carter demonstrated appropriate identification of fixed and moving hazards in the driving environment, and he demonstrated early detection of traffic signs and signals with 100% accuracy. The evaluator determined that his driving habits seemed intact and appropriate during the thirty-four-mile drive.

By order dated June 15, 2023, the claim administrator issued an order granting 0% PPD for the injuries in the claim based on the April 19, 2023, report of Dr. Grady. Mr. Carter protested this order to the Board.

On January 8, 2024, Bruce A. Guberman, M.D., examined Mr. Carter for his work injury. Dr. Guberman noted that Mr. Carter fell fifteen feet and his injuries included a closed skull fracture, temporal epidural hematoma with significant mass effect on the temporal lobe, extensive facial fractures, left and right maxillary sinus fractures, orbital rim fracture, and right mandibular condyle fracture. Upon review of medical records, Dr. Guberman noted that in January of 2023, Dr. Weppner[3] at the Brain Injury Center in

---

[2] According to the *Guides*, DHSL is the decibel sum of the hearing threshold levels.

[3] The record does not include Dr. Weppner's full name.

Roanoke, Virginia, diagnosed Mr. Carter with dizziness, poor short-term memory, persistent dizziness, dysphagia, and also noted that Mr. Carter suffered from occasional headaches, for which he took Tylenol and rested. According to Dr. Guberman, in January of 2023, Dr. Rogers noted that Mr. Carter still had intermittent watering from both eyes and nasal mucus. Further, Dr. Guberman noted that in January of 2023 Dr. Lenk, an orthodontist, recommended orthodontic care, which had not yet been performed.

Mr. Carter told Dr. Guberman that he continues to experience constant pain in his head in various locations and that he suffers from severe headaches two to three times per week with associated nausea. For the severe headaches, Mr. Carter said that he takes Ibuprofen, Naproxen, or Tylenol and lies down in a dark, quiet room until they pass. Mr. Carter also reported that he experiences dizziness and lightheadedness almost daily. Further, Mr. Carter reported short-term memory problems and difficulty with concentration. Mr. Carter reported to Dr. Guberman that, in addition to the medications for headaches, his current medications also included Fluticasone nasal spray, Azelastine nasal spray, and Ondansetron as needed. Mr. Carter stated that he did not take any of these medications prior to the injury.

Dr. Guberman found that Mr. Carter continued to experience residual facial pain, head pain, and headaches, which interfere with activities of daily living and require the use of multiple medications. Due to Mr. Carter's ongoing use of medications, Dr. Guberman referred to the text on page nine of the *Guides* and recommended 3% whole person impairment ("WPI"). Dr. Guberman also found that Mr. Carter suffered from memory and concentration difficulties as a result of his injury. Referring to Table 2 of the *Guides* on page 142, Dr. Guberman placed Mr. Carter in the first category for 7% WPI for "Mental Status Impairment." After combining the impairments, Dr. Guberman opined that the compensable injury left Mr. Carter with a total of 10% WPI. Dr. Guberman recommended a psychiatric/psychological consultation related to Mr. Carter's depression, anxiety, mood changes, nightmares, and mood control difficulty.

On October 8, 2024, Christopher Martin, M.D., examined Mr. Carter and authored a report. Dr. Martin reviewed treatment records and found that Mr. Carter was no longer under any active treatment for his injuries. Dr. Martin said that Mr. Carter reported that he experienced headaches or head pain daily, and the pain awakened him two to three times per week. Further, Mr. Carter told Dr. Martin that he also has pain in his shoulders, upper back, hips, and knees. Mr. Carter told Dr. Martin that his main problem now is overall pain and depression. Mr. Carter also expressed frustration about conflicting information regarding what he can and cannot do and concern about securing employment. While Mr. Carter was concerned about daily watery eyes, Dr. Martin noted that he also complained that his eyes were severely dry at times. Further, Mr. Carter complained of extreme mood swings, nasal stuffiness, nightmares, strange dreams, and hearing loss that made it difficult for him to understand speech. As for medication use, Mr. Carter told Dr. Martin that the only medications he uses are Tylenol and Ibuprofen, which he takes two or three times per

4

week for migraines. Dr. Martin determined that Mr. Carter was at MMI for his compensable physical injuries in the claim. Referencing Chapter 4 of the *Guides*, Dr. Martin found no impairment related to the skull fracture and epidural hemorrhage as he found "no consistent evidence of limitations in activities of daily living," noting the findings of a functional capacity evaluation performed in May of 2023. Regarding the facial fractures, Dr. Martin referred to Table 6 on page 231 of the *Guides* and found 0% impairment because Mr. Carter had no dietary limitations. Dr. Martin also found no impairment for the facial fractures under Table 7 on page 233 because there was no speech impairment. Since Mr. Carter denied concerns about the lip laceration, Dr. Martin assigned no impairment for a skin disorder in Table 2, page 280 of the *Guides*. Overall, Dr. Martin found no impairment related to Mr. Carter's compensable conditions, but he noted that he did not address any psychiatric impairment because he was not a psychiatrist.

Dr. Martin reviewed the report of Dr. Guberman and expressed his disagreement with it. First, Dr. Martin disagreed with Dr. Guberman's finding of 7% WPI from Table 2 on page 142 of the *Guides* for mental status impairment because he felt it was unsupported by the functional capacity evaluation. Second, Dr. Martin disagreed with Dr. Guberman's impairment rating for the use of medications because Mr. Carter was not using any prescribed medication and instead only used over-the-counter medication two to three times per week. Dr. Martin also noted that the *Guides* provided examples for impairment ratings for medication use. These examples were essential hormone replacement medications, which Dr. Martin felt significantly differed from the medications Mr. Carter took to merely relieve symptoms. Thus, Dr. Martin did not feel that Dr. Guberman's impairment rating was consistent with the *Guides*.

On April 16, 2025, the Board affirmed the claim administrator's order granting 0% PPD. The Board based its decision on the reports of Drs. Grady and Martin. Mr. Carter now appeals the Board's order.

Our standard of review is set forth in West Virginia Code § 23-5-12a(b) (2022), in part, as follows:

> The Intermediate Court of Appeals may affirm the order or decision of the Workers' Compensation Board of Review or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the Workers' Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:
>
> (1) In violation of statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the Board of Review;
> (3) Made upon unlawful procedures;
> (4) Affected by other error of law;

(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Syl. Pt. 2, *Duff v. Kanawha Cnty. Comm'n*, 250 W. Va. 510, 905 S.E.2d 528 (2024).

Mr. Carter argues that the Board erred in failing to accept Dr. Guberman's assessment of 10% WPI, as his findings were more accurate and his evaluation more comprehensive of Mr. Carter's nuanced impairment related to his mental status and medication use. Further, Mr. Carter asserts that Drs. Grady and Martin minimized his cognitive sequelae and mental status impairment, undermined his credibility without substantial evidence of malingering, and misinterpreted the criteria provided on page nine of the *Guides* regarding medication used to manage symptoms. Mr. Carter asserts that Dr. Martin incorrectly opined that the medications contemplated on page nine of the *Guides* relate exclusively to hormone medications. Instead, Mr. Carter contends that Dr. Guberman's interpretation was correct because the *Guides* only mention medications used for hypothyroidism and diabetes as examples, but the *Guides* do not limit the applicability of this section to such medications. In sum, Mr. Carter argues that the Board should have adopted Dr. Guberman's impairment rating as his report was the most credible report of record. Thus, Mr. Carter asks that the Board's order be reversed because Drs. Grady and Martin narrowly focused on his physical healing rather than the full extent of his long-term functional limitations and treatment needs. We disagree.

In its analysis, the Board considered that Dr. Guberman's impairment rating included 3% WPI due to several medications that Mr. Carter took as a result of his injury. However, the Board noted that when Dr. Martin evaluated him, Mr. Carter said that he no longer used the medication. Thus, Dr. Martin disagreed with Dr. Guberman's 3% WPI rating, which was derived from page nine of the *Guides*. The Board found Dr. Martin's findings regarding head and facial pain to be persuasive, noting that his findings were supported by Dr. Grady's report.

The Board also noted that Dr. Guberman's impairment rating included 7% WPI for Mental Status Impairment derived from Table 2 on page 142 of the *Guides*. Table 2 is located under section 4.1b of the *Guides*, and relates to Disturbances of Mental Status and Integrative Functioning. Under this section, the *Guides* provide a list of ten "characteristics or capabilities," which should be documented by the examining physician.[4] The Board

---

[4] Among the documentation that, according to the *Guides*, should be included with a mental status assessment, is information concerning: "(1) orientation concerning time, person, and place; (2) recent recall; (3) ability to remember and repeat a series of digits…; (4) ability to perform serial subtraction of 7s from 100 or 3s from 20; (5) ability to do other simple calculations; (6) ability to repeat three unrelated words; (7) ability to spell a word

determined that Dr. Guberman did not document any of these characteristics and capabilities, and therefore, it found his report was not reliable.

Upon review, we find that the Board was not clearly wrong in finding that Mr. Carter did not establish that his compensable injury resulted in permanent impairment, except for possible psychiatric impairment. That impairment has not yet been rated because all three examining physicians acknowledged a compensable psychiatric injury may still be allowed, but none were qualified to assign a rating without a formal psychiatric medical evaluation; each recommended such an evaluation. We decline to determine the applicability of the criteria provided on page nine of the *Guides* regarding medication used to manage symptoms in this case, as it is unnecessary to do so since the Board also found that Dr. Guberman's impairment rating was unreliable because he did not provide documentation regarding his rating for Mental Status Impairment. Mr. Carter asserts that the *Guides* do not require that all ten characteristics under section 4.1b be met in order to qualify for an impairment rating under that section. However, we note that Dr. Guberman failed to document that he performed any of the objective tests provided under section 4.1b. Instead, Dr. Guberman based his impairment rating on Mr. Carter's self-reported difficulty with his memory and simple mathematics. We find that the Board's determination that Dr. Guberman's report was unreliable because he did not document "any" of the characteristics under section 4.1b was not clearly wrong in view of the reliable, probative, and substantial evidence on the whole record.

As the Supreme Court of Appeals of West Virginia has set forth, "[t]he 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996). With this deferential standard of review in mind, we cannot conclude that the Board was clearly wrong in affirming the claim administrator's order granting a 0% PPD award.

Accordingly, we affirm the Board's April 16, 2025, order.

Affirmed.

**ISSUED:** December 22, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge Daniel W. Greear
Judge S. Ryan White

---

such as 'world' forward and backward; (8) ability to repeat a short paragraph; . . . and (10) judgment."

7